## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## ATHENS DIVISION

| | | |
|---|---|---|
| **J & V DEVELOPMENT, INC.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| vs. | : | **3:03-CV-16 (CAR)** |
| | : | |
| **ATHENS-CLARKE COUNTY, et al.,** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

_____

### *ORDER ON PLAINTIFF'S AND DEFENDANTS' <u>DAUBERT</u> MOTIONS*

This case is before the Court on Plaintiff's [Doc. 37] and Defendants' [Doc. 48] Motions in Limine (also known as <u>Daubert</u> Motions).  The Court held a <u>Daubert</u> hearing on Thursday, August 4, 2005, in Athens, Georgia and now issues the following rulings. This Order does not memorialize everything stated at the hearing but merely provides a summary of pertinent testimony, legal standards, application of the standards to the testimony, and the evidentiary rulings.  Defendants' Motion is **GRANTED IN PART AND DENIED IN PART,** and Plaintiff's Motion is **DENIED AS MOOT.**

### BACKGROUND

This case arises from a dispute between Plaintiff J & V Development, Inc. (J&V) and Defendant Athens-Clarke County (ACC)[1]  over a permit for land development. Plaintiff applied for a Special Land Use Permit (SLUP) to develop a subdivision of 259

---

[1]     The Court uses "ACC" in this Order to denote  Defendant as the government agency and also as the geographic location of Plaintiff's proposed subdivision.

single-family, detached homes in a price range of $99,000 to $144,900 in Athens-Clarke County, Georgia.  In February of 2003, Defendant ACC's mayor and commission denied Plaintiff's SLUP application.  In March of 2003, Plaintiff sued Defendants in this Court claiming that Defendants' denial of the SLUP permit violated Plaintiff's and its prospective home purchasers' rights under the Fair Housing Act (FHA), 42 U.S.C. § 3601 et seq.  Plaintiff more specifically alleged that the denial of the permit had a disparate impact on low-income minorities who could have afforded homes in the proposed subdivision.

Plaintiff identified Dr. Douglas C. Bachtel, a professor in the Department of Housing and Consumer Economics at the University of Georgia, as its FHA expert witness on statistics, demographics, and affordable housing in ACC.  Bachtel reviewed the information Plaintiff gave him about the events leading up to the litigation, as well as Plaintiff's claim that ACC's action had a disparate impact on minorities.  Defense counsel received a copy of Bachtel's expert report and took his deposition.

Defendants identified Dr. Roger Tutterow as their expert witness and produced his expert report. Tutterow is an economist and statistician. Plaintiff's counsel took his deposition.

Tutterow has a limited role as an expert in this case.  He has focused on refuting the methodology that Bachtel used to reach some of his key conclusions.  Both parties filed Daubert motions to exclude the testimony of each other's expert.

At the Daubert hearing, the Court heard testimony from Bachtel, Tutterow, and Plaintiff's representative (Vick, the "V" in J&V Development).  Before the hearing, the Court reviewed the depositions of the experts, the parties' motions, the Rule 26 expert

2

disclosures, expert reports, the experts' curriculum vitae, and case law on <u>Daubert</u> issues.

At the outset of the hearing, the Court advised counsel that it intended to ask Bachtel a number of questions based on the Court's review of his deposition. The Court then explained that both Plaintiff's counsel and Defense counsel would have the opportunity to examine the witness and present any other evidence they believed might help the Court rule on the motions. The Court will now briefly recite some of the testimony as background and also focus on the parts most pertinent to its rulings on the motions in limine.

## I.     **Dr. Bachtel, Plaintiff's Expert**

### A.     **Court's Examination of Bachtel**

Based on the Court's review of Bachtel's curriculum vitae, the Court began its inquiry by acknowledging Dr. Bachtel's work with various Chambers of Commerce and development authorities in Georgia, his study of demographics in Georgia, and his understanding of the need for low-income housing and its impact on communities. After recognizing Bachtel's expertise in sociology, the Court explained its interest in determining if his expertise authorized him to give certain opinions in this case and if he had used a reliable methodology to reach such opinions.

As part of his opinions, Bachtel explained the importance of "affordable" or "labor-force" housing. Workers who have jobs in ACC but live in other counties take their paychecks home and do not spend their earnings in ACC. Low-income workers should both work and live in ACC to sustain the county's economic development.

Bachtel admitted, however, that he had done no studies or research to show the

market base for Plaintiff's proposed development.[2]  He conceded that the market for homes in the proposed subdivision would likely include residents of other counties, not just Clarke County.   He based his opinion about the market for homes in the subdivision on assumptions and anecdotal data.

Bachtel acknowledged his lack of expertise in home financing and housing markets in general, but he agreed that home financing is an important component of economic development in the community.  Bachtel testified that he does not the know names of or details about programs for low-income financing, but he does know that such programs exist and make it possible for low-income workers to purchase homes.  He offered no opinions about the specifics of such financing programs.

Bachtel testified that he asked Plaintiff's counsel how low-income minorities could afford the homes in Plaintiff's proposed subdivision, and he learned that Plaintiff planned to develop programs to provide financial assistance for minorities. Bachtel admitted that he had done no research to show that lower-income minorities could afford homes in the price range of the proposed development.

On this issue the Court observed that the affordability of homes in the proposed development was a major premise of Bachtel's opinions and that he had merely assumed affordability based on what Plaintiff told him.  Bachtel admitted that if low-income minorities could not get special financing, they could not afford the homes.  Bachtel also

---

[2]     When the Court uses the term "market" in talking about the market for homes in Plaintiff's proposed development, the Court includes not only those persons who could afford homes in Plaintiff's development, but also those persons who could both afford the homes and have an interest in purchasing the homes.

4

admitted that he had no expertise in lending practices, down payments, credit ratings, and interest rates.

Bachtel further testified that the down payment is the biggest barrier that low-income and young people have in purchasing a home. He explained that by looking at the census data on minorities, one can learn information about where they work, what they earn, and their ability to make a down payment. He also noted that a large percentage of African-Americans living in ACC work in manufacturing jobs earning higher wages than most other workers in the area. Although these workers might be able to afford monthly house payments, they would have trouble making a down payment.

Bachtel testified that 40% of the ACC population is African-American and that 23% of the African-Americans live below the poverty line. Bachtel described the two groups within the black population as a bi-modal demographic. The first group lives in poverty and could not afford homes in Plaintiff's subdivision, but with special financing, the second group could afford the homes.

Bachtel did not study any data or offer any opinions about the job market for the manufacturing plants near Plaintiff's proposed development. He stated that there is both low unemployment and a high number of jobs available in ACC, but the lack of affordable housing means that residents of other counties take jobs in ACC. Bachtel also testified that many ACC residents have low skill and education levels that make it harder for them to compete for jobs.

On the need for affordable housing in ACC, the "Community Connection" provided

5

an important source of information for Bachtel's opinions.[3]  He said that according to this agency, affordable housing is one of the top ten concerns of callers.  The agency does not keep any records based on calls according to race, but  Bachtel explained that agency workers know from hearing the callers' voices that many Hispanics call about affordable housing.  (The Court expressed its concern about the anecdotal nature of the information from the Community Connection during the hearing.)

Bachtel admitted at the hearing, as he had said in his deposition, that there was no way to know if blacks or Hispanics would live in Plaintiff's subdivision. [Bachtel Dep. p. 111].  Bachtel said that one would have to do a survey to determine that information, but he did not do such a survey.  Bachtel further explained that one would just think that lower-income home buyers would gravitate to affordable housing.

### B.   Plaintiff's Direct Examination of Bachtel

After the Court finished questioning the witness, Plaintiff's counsel examined Bachtel about the "methodology" he used in arriving at his opinions in this case.  Bachtel described his method as the "macro" or "totality of the information" approach. As a sociologist and demographer, he looked at various data on the ACC community, such as its population and available jobs.  Specifically, Bachtel considered seven points: Plaintiff's proposed project, race and ethnic groups in the population, housing structure (renters versus owners), housing values by race and ethnicity, housing needs, financial issues, and employment issues.  His sources included census data, school board data, and vital statistics

---

[3]    The Community Connection of Northeast Georgia is a non-profit, multi-program human resource agency that provides services to fourteen counties in the northeast Georgia area, including ACC. This information is not in the record.

from both published and unpublished sources.

First, Bachtel considered Plaintiff J&V's proposed subdivision. According to his testimony, the location of the subdivision is close to and even within walking distance of some major manufacturing industries that employ a high percentage of African-Americans. Also, the price range of homes in the development would offer various levels of affordability, which would promote a diverse population in the neighborhood. Bachtel said that America, Georgia, and ACC need more integrated neighborhoods and that this development would improve integration.

Second, Bachtel looked at the racial and ethnic populations of ACC. Thirty percent of the estimated 100,000 people in ACC are students, not permanent residents, and 40% of the permanent population are African-American. ACC has the fourth highest percentage of African-Americans of any county in Georgia. He also said that the Hispanic population is quite large but undercounted. Fifteen percent of the ACC population are Hispanic, according to school data, which is more reliable than census data in counting the Hispanic population. Bachtel said that with such high percentages of low-income minorities residing in ACC, Defendant needs to make affordable housing available to them.

Third, Bachtel compared owners and renters in the housing market. In ACC 40% of the population own homes, and the remaining 60% rent. He also noted that there are more minorities in the renter category. According to Bachtel, the Athens Banner-Herald newspaper and the Community Connections agency have found a dearth of affordable housing in ACC, and Plaintiff's proposed development would help alleviate this problem.

He also testified that some of the neighborhoods in ACC are segregated by race

because of affordability.  Bachtel explained that although he does not think that minorities are intentionally steered to live in some neighborhoods over others, he thinks that Defendant's denial of the proposed development eliminated an opportunity for integration. Bachtel gave no facts to support that assertion and stated that such a conclusion was just his opinion. (The Court understood Bachtel to mean that this opinion is unsupported by his methodology.)

Fourth, Bachtel looked at census data on home ownership by race and ethnic group. He also considered the census data about the value of the homes owned by minorities.  The bar graphs Bachtel prepared from the 2000 census data [Plaintiff's Exhibits 14, 15] demonstrate, in his opinion, that the combined percentages of African-Americans and Hispanics who own homes in ACC valued at $100,000 to $149,900 exceed the percentage of whites who own homes in the same price range. He said that one can reasonably apply existing housing patterns from the 2000 census to proposed developments because the demographics of home ownership change very slowly.

Based on the census data depicted in the bar graphs, Bachtel opined that Defendant's denial of Plaintiff's proposed subdivision disproportionately impacted blacks and Hispanics because the subdivision would have offered homes in the price range where the highest percentages of homeowners in ACC are African-American and Hispanic.  (The Court notes that this is the most important opinion Bachtel offers in this case and the chief focus of the Court's inquiry.)

Fifth, Bachtel looked at housing needs.  He said that the Community Connection provides the best source for understanding housing needs in ACC.  He testified that reliable

8

projections show that 2,000 additional houses a year are needed and that the Housing and Economic Development Department at the University of Georgia and the ACC government relied on this estimate for planning.

Sixth, Bachtel considered factors such as the affordability, price range, and the mixed price range of the subdivision.  Seventh and lastly, Bachtel considered employment issues, such as the proximity of job centers to the subdivisions.  He reviewed <u>Georgia Department of Labor: Firms, Employments, and Wages</u> and assessed the breakdown of industry and wage rate sectors.  Bachtel testified that most minorities in ACC work in manufacturing jobs earning an average weekly wage rate of $889.00,  higher than the $661.00 average for all ACC workers.

Bachtel concluded, based on his use of the  "macro" or "totality of the information" approach, that ACC's denial of Plaintiff's housing development eliminated an excellent opportunity for minorities to purchase affordable housing.  He further believes that this denial  impacted minorities more than whites.

### C.      Defendants' Cross-Examination of Bachtel

After Plaintiff's counsel completed her direct examination of Bachtel, Defense counsel cross-examined him.  Bachtel admitted that when deposed he testified that the methodology described by Tutterow was appropriate for analyzing minority impact in this case and that he did not use that methodology.  Bachtel also admitted that he had not outlined his methodology, the "macro" approach, in his expert disclosure or at any time before the hearing. Bachtel further admitted that his expert disclosure contained inaccurate information about the price range of the subdivision.  Bachtel signed this disclosure even

though he had learned the correct price range and could have amended the disclosure before signing it.

Bachtel testified that the bar graph [Pl's Exh. 14, 15] contained information from the United States Census for 2000 about home ownership in ACC. He acknowledged that the census does not distinguish between recently purchased homes in a value range and homes that have appreciated to that value range. Defense counsel cross-examined Bachtel about the percentages in the bar graph. Defense counsel pointed out that the bar graph does not reflect how many owner-occupied homes in the development's price range are owned by blacks, whites, or Hispanics. Rather, the graph only depicts the percentage of blacks, whites, and Hispanics who live in housing within that price range in ACC.

## II.   **Tutterow's Rebuttal of Bachtel's Methodology**

The Court initially noted that Dr. Tutterow's expertise had limited application in this case, and he agreed. Tutterow is not an FHA expert; he is an expert in economics, statistics, econometrics, finance, and economic and demographic data. He was recently appointed Dean of the Mercer University Business School.

Tutterow testified that Defense counsel asked him to review Bachtel's report to determine the validity of Bachtel's methodology and conclusions. The Court essentially limited Tutterow's testimony to challenging Bachtel's statistical analysis of the economic and financial components of the alleged disparate impact on minorities caused by the county's denial of the SLUP permit. Both Tutterow and Defense counsel agreed to this general limitation.

Tutterow began with a discussion of inflation and responded to Bachtel's opinion

10

that inflation had nothing to do with this case.  For example, Bachtel testified that the number of units of housing valued above $50,000 in ACC increased from 1990 to 2000. Tutterow explained that the increase in homes valued over $50,000 does not necessarily show a change in the quantity of affordable housing being built from 1990 to 2000.  He stated that this increase in housing units in ACC valued at more than $50,000 could be explained completely by the fact that inflation has risen 30% during the same time.  He concluded, therefore, that the values of existing housing would also rise with inflation. Tutterow gave this explanation as an example of how inflation could affect this case to contradict Bachtel's statements that inflation has no effect.

Tutterow then addressed the bar graphs that Bachtel prepared from the 2000 census data about the value of homes in ACC.  [Pl's Exh. 14, 15].  He described his misgivings about the use of census data on home ownership because of the assumptions one has to make about the data.  First, one has to assume that census data about minority home ownership in certain price ranges also accurately measures the current market for homes in the same price ranges.  This assumption does not take into account the true market for homes in certain price ranges.  The true market would consist not only of those persons who could afford such homes, but also those who were interested in purchasing homes in the subdivision.

Second, the census reflects only what people say their homes are worth, which raises questions about the reliability of the census data on home values.  Third, Tutterow noted that the census data shows that the sampling pool of Hispanics for the census in ACC was very small, and this tends to diminish the accuracy of the statistics.  Sampling such a

11

small pool can result in a significant margin of error and skew any conclusions drawn from that data. Tutterow recommended testing for the statistical significance of the sampling numbers before relying on any conclusions about the Hispanic data.

Altogether, Tutterow expressed concerns about Bachtel's use of the 2000 census as a basis for his opinions, but Tutterow acknowledged that such data is widely used and accepted for various purposes.[4] Tutterow summarized his concerns about using the census data by explaining that one must recognize the potential for drawing flawed conclusions from the data. See Sandoval v. Hagan, 7 F. Supp. 2d 1234, 1295 (M.D. Ala. 1998), rev'd on other grounds by Alexander v. Sandoval, 532 U.S. 275 (2001) (finding that expert testimony about the degree to which United States Census data inaccurately reflected minority population was admissible and that the expert could present cautionary notes in interpreting census data).

Tutterow then explained that regardless of the pitfalls of using census data as a basis to support economic opinions, Bachtel used the census data incorrectly and reached a false conclusion.  In fact, properly using the data that Bachtel considered leads to the completely opposite conclusion from what Bachtel offered.  Tutterow testified that Bachtel's data

---

[4]     This Court understands that other courts have approved the use of census data to support opinions about population size, racial distribution in a population, the numbers of owner-occupied homes in a community, and the percentages of various races living in certain price ranges or types of housing.  See, e.g., Arthur v. City of Toledo, Ohio, 782 F.2d 565, 576 (6th Cir. 1986) (affirming district court's decision that was partly based on census data on racial breakdown of low-income persons eligible for housing program); Dews v. Town of Sunnyvale, Tex., 109 F. Supp. 2d 526, 538-39 (N.D. Tex. 2000) (stating that census data reported the town's population, including breakdown of races, as well as owner-occupied and renter-occupied housing units, with breakdown of races in those units).  The Court, however, has not found, nor has Plaintiff directed the Court's attention to, any case that shows a court's acceptance of or reliance on census data to show that home ownership accurately reflects the housing market in certain price ranges in a given community.

shows that the disparate impact of ACC's action in denying the permit for the subdivision falls disproportionately on whites, not on blacks and Hispanics or a combination of minorities.

Tutterow testified that one should begin an analysis of the census data in this case by looking at the total number of owner-occupied homes already in ACC that fall in the price range of homes Plaintiff intends to offer in the proposed subdivision. An analysis of the full price range of the proposed subdivision would encompass combining two of the bar graph sections prepared by Bachtel. Most importantly, Tutterow explained how the data depicted in the bar graphs demonstrates the percentage of homes owned by each group that fall in a specified price range, not the percentage of homes in a specified price range that are occupied by members of the groups depicted in the graphs.

Tutterow further testified that because the graphs do not show the percentage of homes owned by each group within a specified price range, aggregating the data does not show the combined percentages of African-Americans and Hispanics in the combined price ranges. When one looks at the data from the proper perspective of percentages of each minority group who live in the proposed price range, it actually shows that any disparate impact falls on whites; it does not fall on blacks, Hispanics, or blacks and Hispanics together. Defense Exhibit 1 summarizes Tutterow's numerical findings. Tutterow concluded that one cannot use the graphs and methodology Bachtel follows to show disparate impact against blacks and Hispanics.

The Court questioned Tutterow about his methodology and conclusions. He explained that he did not do his own minority impact analysis; he reviewed Bachtel's data

source, analysis, and conclusions and pointed out weaknesses and problems in Bachtel's approach.  Tutterow further said that he could not ascertain a chosen methodology from Bachtel's expert disclosure or deposition testimony, which relied in part on anecdotal data about poverty and housing in ACC.  In sum, Tutterow used Bachtel's same data to demonstrate flaws in Bachtel's methodology and conclusions on disparate impact.

## III.    Reply by Bachtel to Tutterow

The Court gave Bachtel the opportunity to respond to Tutterow's criticism of Bachtel's methodology.   When shown Defense Exhibit 1 containing Tutterow's percentages, Bachtel stated that he had not had the opportunity to study the exhibit. Bachtel acknowledged, however, that it reflects the same census data that he used to make the bar graphs but in a different format.  He said that it combines the two price ranges on the bar graph to show the whole range of the proposed development.  Bachtel disagreed with combining blacks and Hispanics because of the complicated issue of "Hispanic" as an ethnicity and not a race.  Bachtel said some Hispanics would label themselves as "black," some as "white," and some as "other" in the racial categories on the census.  Bachtel would not have combined them for analysis purposes, but otherwise, he could not disagree or explain how Tutterow arrived at different numbers using the same census data.[5]

Bachtel also reiterated his reliance on the Community Connection's information that questions about affordable housing are frequent, while at the same time admitting that the

---

[5]       Tutterow replied that Bachtel is correct about the Hispanic ethnicity issue.  Tutterow said he only made this combined category because Plaintiff's counsel asked Tutterow in his deposition to combine these categories. Tutterow pointed out that one can still see the separate black and Hispanic breakouts in the above categories.

agency does not keep statistics according to race.  He concluded by saying that one can debate the statistics until hell freezes, but because the Community Connection gets so many calls about affordable housing, common sense says that the lack of affordable housing is a problem in ACC. [6]

## IV.   Randy Vick for Plaintiff J&V Development

In response to the Court's concerns that Bachtel merely assumed the "affordability" of housing in the subdivision as a key element of his opinions, Plaintiff's counsel offered the testimony of Randy Vick, one of  Plaintiff's representatives.

Vick is a developer, a realtor, and he sells land lots to builders.  He has developed eight subdivisions and is currently working on two more.  Some of his developments have offered  "affordable" homes that cost between $130,000 and  $150,000. Vick testified that first-time buyers purchased most of the homes in the other "affordable" subdivisions he has developed.  Vick stated that the buyers were 30% white, 30% black, and 30% Hispanic. He explained that "affordable" housing means that the homes cost less than FHA guidelines for loan amounts.

According to Vick, the proposed subdivision would have the same type of neighborhood with affordable housing that he has developed before, but much nicer.

---

[6]
See generally Wessmann v. Gittens, 160 F.3d 790 (1st Cir. 1998), which also involved the expert testimony of a sociologist who relied on anecdotal data. As the Court explained: Dr. Trent's reliance on anecdotal evidence fares no better.  As a general matter, anecdotal evidence is problematic because it does not tend to show that a problem is pervasive. See Coral Const. Co. v. King County, 941 F.2d 910, 919 (9th Cir. 1991) ("While anecdotal evidence may suffice to prove individual claims of discrimination, rarely, if ever, can such evidence show a systematic pattern of discrimination necessary for the adoption of an affirmative action plan."). Thus, even though anecdotal evidence may prove powerful when proffered in conjunction with admissions or valid statistical evidence, anecdotal evidence alone can establish institutional discrimination only in the most exceptional circumstances.  Wessmann, 160 F.3d at 805-06.

Plaintiff could offer a higher quality product at a lower price in this development because of the price it paid for the land.  He further explained that the homes in the proposed development would have between 1,200 and 1,500 square feet and include garages.  The neighborhood would also have a pool and tennis courts.

Vick testified that first-time home buyers or lower-income buyers commonly use FHA financing.  FHA allows a purchaser to borrow 103% of the home's appraised value, which includes the closing costs in the amount financed.  FHA also allows the seller to pay the down payment or allows the buyer to borrow the down payment from another source.

The Veterans Administration (VA) program offers an option for veterans that allows a loan of 100% of the home's appraised value, which means that the buyer does not have to afford a down payment.

There are also 80/20% loans that allow borrowers to finance a down payment through a 20% second mortgage and also avoid paying private mortgage insurance.  Vick testified that he gave Bachtel most of the information about financing the homes in the proposed development.

## DISCUSSION

## I.    Motions in Limine or Daubert Motions

The admissibility of expert opinion testimony is governed by the Federal Rules of Evidence.  Rule 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the

product of reliable principles and methods, and (3) the witness has applied
the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Thus, relevant expert testimony is admissible only if the trial court finds

that the expert is qualified to testify about the matters he intends to address; and that the

methodology used by the expert to reach his conclusions is sufficiently reliable; and that

his testimony will assist the trier of fact, through the application of scientific, technical or

specialized expertise, to understand the evidence or determine a fact in issue.  McCorvey

v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002) (citing Maiz v. Virani,

253 F.3d 641, 664 (11th Cir. 2001)).

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 590 n.9 (1993), the

United States Supreme Court stated that "the requirement that an expert's testimony pertain

to 'scientific knowledge' establishes a standard of evidentiary reliability," and this

"*evidentiary reliability* will be based upon *scientific validity*."  A Daubert analysis,

therefore, focuses on the expert's method in forming opinions and asks the question — is

the expert's method reliable?  In other words, are the expert's opinions *trustworthy*?  See

id., 590 n.9.  The burden of proof on this issue falls on the party offering the expert witness.

See McClain v. Metabolife Int'l, Inc., 401 F.3d 1233 (11th Cir. 2005).

To aid courts in assessing the reliability or trustworthiness of an expert's scientific

opinions, the Court in Daubert articulated four non-exclusive tests or factors that courts

may use when evaluating expert testimony based on scientific knowledge: (1) testability,

(2) error rate, (3) peer review and publication,[7] and (4) general acceptance.  509 U.S. at

---

[7]        Some courts separate peer review and publication and refer to five Daubert factors.

593-95.

In Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), the Supreme Court expanded the Daubert analysis to include non-scientific expert testimony. The Court there, however, rejected the notion that the factors set forth in Daubert were always relevant, noting that:

> The conclusion, in our view, is that we can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in Daubert, nor can we now do so for subsets of cases categorized by category of expert or by kind of evidence. Too much depends upon the particular circumstances of the particular case at issue.

Id. at 150. The Court explained that the Daubert factors "may or may not be pertinent;" it will depend "on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Id. Other circuit courts and the advisory committee notes under Federal Rule of Evidence 702 offer other factors or tests to use in analyzing an expert's testimony. Id. at 152. Moreover, the trial court has "considerable leeway" in deciding which tests or factors to use to assess the reliability of an expert's methodology. Id.

In testing for reliability, the Court must examine the methodology supporting each expert's opinion step-by-step. If the chain of reliability is broken at one step, then the Court should not admit the expert's opinions based on the faulty methodology. "The Daubert 'requirement that the expert testify to scientific knowledge — conclusions supported by good grounds for each step in the analysis — means that *any* step that renders the analysis unreliable under the Daubert *factors renders the expert's testimony inadmissible*.'" McClain, 401 F.3d at 1246 (citing Amorgianos v. AMTRACK, 303 F.3d 256, 267 (2nd Cir. 2002)).

In assessing Bachtel's sources, methodology, and conclusions, <u>Daubert</u> requires the trial court to act as a gatekeeper to insure that speculative and unreliable opinions do not reach the jury. 509 U.S. at 589 n.7, 597. As the gatekeeper, the court must do "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." <u>Id.</u> at 592-93. The Court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." <u>Kumho</u>, 526 U.S. at 152.

In sum, the Court must determine whether "the proponent...demonstrate[s] that the witness is qualified to testify competently, that his opinions are based on sound methodology, and that his testimony will be helpful to the trier of fact." <u>Cook v. Sheriff of Monroe County</u>, 402 F.3d 1092, 1107 (11th Cir. 2005) (citations omitted). The Court will apply the <u>Daubert</u> factors and the factors mentioned in the advisory committee notes on Rule 702 to the evidence offered at the hearing. The Court finds that all these factors are helpful in this case.

### A.    Defendants' Motion

Defendants filed their Motion in Limine or <u>Daubert</u> motion on March 4, 2005 [Doc. 48]. In their motion Defendants seek to exclude the expert testimony of Plaintiff's expert witness, Dr. Douglas Bachtel, and argue that he used an invalid methodology to support his opinions. Plaintiff filed a response on March 28, 2005 [Doc. 56], and Defendants replied on April 28, 2005 [Doc. 61].

In ruling on this motion, the Court first notes that although Bachtel's opinions do not involve questions of pure science, they do involve questions of social science. As a social scientist, Bachtel commonly uses statistics, and his discipline and this Court require the accurate use of statistics. Consequently, to the degree to which he bases any of his opinions on bad statistics, he has used a flawed methodology, and those opinions are inadmissible.

In ruling on his opinions in this case, the Court finds that Bachtel has the requisite expertise to offer a variety of opinions about the demographics of ACC, including, for example, his opinion that ACC needs more "affordable" homes. Bachtel, however, stated repeatedly that he relied on Plaintiff and Plaintiff's counsel to tell him that minorities could afford the homes planned for the subdivision.

The Court finds that this source of information offers very weak support for his major conclusions on disparate impact that all hinge on the affordability of the homes. But the evidence is not so weak that it defeats his key opinions about disparate impact. The Court will not exclude his opinions that rely on weak evidence about the affordability of the homes because the Court finds that this weakness goes to the weight of Bachtel's opinions, not their admissibility.

The Court, however, does find that the final step in Bachtel's opinion testimony, that the denial of the SLUP permit for Plaintiff's proposed development impacts minorities more than it does whites, is a separate conclusion based on scientific, technical, or specialized knowledge that must rest on a valid methodology. Plaintiff has not carried the burden of showing a reliable methodology to support Bachtel's disparate impact

opinions.

Applying the <u>Daubert</u> test to Bachtel's testimony, the Court finds that Plaintiff offered very little testimony to satisfy any of these tests.  Specifically, the Court finds that (1) Bachtel did not explain how one can test his methodology, but when Tutterow did test it, he exposed the statistical flaws underlying Bachtel's key opinions.  (2) Bachtel offered no testimony about the error rate for his methodology.  (3) He gave no information about the peer review of his methods or key opinions. (4) He offered no testimony about publication of this methodology as it applies to his key conclusions in this case. (5) Finally, he has offered no evidence about the general acceptance of his methods for reaching his final opinions about disparate impact.

The advisory committee notes under Federal Rule of Evidence 702  offer several other tests that a court may use in determining the reliability of an expert's opinions.  The Court will now apply these additional factors to Bachtel's testimony.

The first additional test considers whether the expert is offering opinions about matters growing naturally and directly out of his research independent of the case, or whether he has developed his opinions expressly for purposes of testifying.  Bachtel explained that much of his testimony derives from his independent research and expertise, and the Court accepts that explanation for most of his opinions about the racial and economic demographics of ACC.  Bachtel's key conclusions on disparate impact, however, rest on data and information outside his expertise, such as knowledge of the actual market for homes in ACC and home financing, issues about which he has no formal training, expertise, or experience.  Thus, his opinions on the issue of disparate impact in the ACC

21

housing market appear to arise, at least for the final step, from work done for this case. Moreover, Bachtel admitted that he is an "advocate" for work-force housing.

The second test examines whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion. Tutterow's explanation of Bachtel's misuse of census data to reach his conclusion about disparate impact demonstrates a clear example of extrapolation from an accepted premise to an unfounded conclusion.

The third test asks whether the expert has adequately accounted for obvious alternative explanations. Bachtel did not offer any alternative explanations for Tutterow's use of Bachtel's data to contradict Bachtel's opinions when given such an opportunity at the hearing.[8]

The fourth test evaluates whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting." <u>Sheehan v. Daily Racing Form, Inc.</u>, 104 F.3d 940, 942 (7th Cir. 1997). Bachtel did not explain the care he employs within his usual work compared with the care he took in rendering his key opinions in this litigation. Consequently, the Court cannot reach a conclusion favorable to Plaintiff using this test. But from Bachtel's explanation of his training and background, the Court concludes that his usual professional methods do not support a sound basis for rendering opinions that he has given in this case about the financial aspects of the housing market in ACC, including who would buy the homes in Plaintiff's proposed subdivision.

The fifth factor examines whether the expert's field of expertise is known to reach

---

[8]      The Court did not sequester the witness. The Court allowed both experts to hear each other's testimony.

reliable results for the type of opinion the expert offers in court.  The Court recognizes that as a sociologist with Bachtel's experience, he can testify about demographics, including the racial composition of home ownership in ACC.  Bachtel, however, offered little, if any, testimony to demonstrate that his expertise includes having reliable information about the market for homes in the proposed subdivision.  In fact, Bachtel admitted that someone would have to do a study or survey to answer questions about who might buy homes in this subdivision.  He did not conduct any study or survey on that key issue in this case.  The Court does not find that Bachtel's expertise likely produces reliable results on the main issue in this case.

Bachtel could also have supported the reliability of his methodology by explaining the source or origin of his "macro" or "totality of the information" approach.  Did he make it up himself?  Did he learn it in his training? Did some professional organization devise the approach? Or, did he find the methodology in a textbook or treatise?  He offered no testimony to bolster the reliability of his opinions by showing that his methodology came from an authoritative source.

Applying all of these tests to Bachtel's testimony, and considering the substantial dearth of evidence to satisfy these tests, the Court finds that Plaintiff has not presented adequate testimony to demonstrate the reliability of Bachtel's methodology to admit his key conclusions that ACC's denial of Plaintiff's development had a disparate impact on minorities.  Bachtel's other reliable opinions and his strong credentials cannot salvage the invalidity of his methodology on this key point.  It is insufficient for the expert to merely vouch for the reliability of his own methodology.  Gen. Elec. Co. v. Joiner, 522 U.S. 136,

146 (1997). The Court cannot just take Plaintiff's counsel's or Bachtel's word that his method was reliable and that he gave reliable opinions. See Fed. R. Evid. 702 advisory committee's note (citing Daubert v. Merrell Dow Pharms. Inc. (Daubert II), 43 F.3d 1311, 1319 (9th Cir. 1995)).

Furthermore, and independently, the Court finds that Tutterow demonstrated that Bachtel's methodology, as presented in the bar graphs based on census data, does not support Bachtel's conclusion that ACC's denial of the permit for this development had a disparate impact on minorities. "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co., 522 U.S. at 146; see generally United States v. Mamah, 332 F.3d 475, 478 (7th Cir. 2003) (noting that the problem with the expert sociologists' opinions was "the absence of an empirical link between th[e] research and the opinion.") Bachtel's reading of the census data "doesn't become 'scientific knowledge' just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were 'derived by the scientific method' be deemed conclusive." Daubert II, 43 F. 3d at 1315-16. Thus, Bachtel's conclusions about disparate impact are not supported even by his own methodology and, therefore, lack sufficient reliability to assist the fact finder. The Court finds too great an analytical gap between the data and his opinions about disparate impact.

Plaintiff's counsel argues that any problems with Bachtel's testimony simply go to the weight and not the admissibility of his testimony. The Court finds, however, that incorrect conclusions and unreliable opinions based on a flawed methodology should not be admitted, regardless of the weight given. Likewise, opinions that satisfy few, if any, of

the Daubert factors should not be admitted.

At the hearing Plaintiff's counsel also argued that there are two types of disparate impact housing claims: claims for perpetuation of segregation and claims for impact on minorities. Plaintiff's counsel contended that Tutterow only attacked Bachtel's methodology for one type of impact claim, and Bachtel can still testify about the perpetuation of segregation. The Court finds that this argument is irrelevant to the Daubert inquiry. The Court is simply ruling on what opinions are admissible and what opinions are inadmissible.

In sum, the Court finds that Bachtel can testify about ACC's need for "affordable" housing, the economic impact and advantages of affordable housing in ACC, the racial demographics of ACC, the demographics of homeowners generally and specifically versus renters in ACC, segregated living patterns in ACC, predicted population growth and housing needs in ACC, the problems caused by inter-generational poverty in ACC, the economic configuration of various groups in ACC, wage rates in ACC, the types of businesses that employ African-Americans and Hispanics in ACC, the benefits of home ownership, the down-payment hurdle for low-income home buyers, and other related opinions. The Court will also let Bachtel testify about the values of homes owned according to racial and ethnic patterns; however, as the Court explained in the hearing, the Court has serious doubts about the validity of basing home values on what a homeowner says that his or her property is worth. Yet, this goes to the weight of his opinions on this issue not their admissibility.

Bachtel cannot testify, however, that Defendants' denial of the SLUP for Plaintiff's

development disparately or disproportionately impacted blacks, Hispanics, or a combined group of minorities; that Defendants' actions perpetuated or failed to alleviate segregation in ACC; that Defendants' actions resulted in unequal treatment for minorities or denied them appropriate places to live; or that Defendants' actions had any discriminatory effect. Furthermore, he cannot offer any opinions about the racial and ethnic makeup of the market for homes in the proposed subdivision.

At this point the Court cannot conceive of every opinion that Bachtel might give that would violate this Order, but the Court believes that this explanation gives helpful parameters for the parties to use in both prosecuting and defending this case from this point forward.  If the Parties need further direction about the admissibility of Bachtel's opinions that might not be clear from this Order, the Court will assist the attorneys in a conference call. Accordingly, Defendants' Motion in Limine [Doc. 48] is **GRANTED in part** and **DENIED in part**.

### B.   Plaintiff's Motion

Plaintiff filed its Motion in Limine or <u>Daubert</u> motion on February 14, 2005 [Doc. 37].  In its motion Plaintiff seeks to exclude the expert testimony of Defendant ACC's expert witness Roger Tutterow.  Plaintiff asserts that Tutterow is not qualified as a fair housing expert and should be excluded under Rules 702 and 703 of the Federal Rules of Evidence and <u>Daubert</u>.  Defendants filed a response on March 4, 2005 [Doc. 50], and Plaintiff replied on March 21, 2005 [Doc. 53].

Because Defendants have informed the Court that Tutterow was merely acting as a rebuttal or counter-expert witness to Bachtel, no need exists for the Court to rule on

Plaintiff's Motion in Limine on Tutterow.  The Court understands that Defendants will not further offer Tutterow's testimony in this case given the manner in which Bachtel's testimony has been limited by this Order.  The Court deems Plaintiff's Motion in Limine [Doc. 37] to be **MOOT** and **DENIES** it accordingly.

**CONCLUSION**

For the aforementioned reasons, the Court finds that Defendants' Motion in Limine [Doc. 48] is **GRANTED in part** and **DENIED in part** and that Plaintiff's Motion in Limine is **DENIED as MOOT** [Doc. 37].  As stated before in the Court's Order dated February 25, 2005 [Doc. 47], the parties shall have two weeks from the date of this ruling on the <u>Daubert</u> motions in which to file motions for summary judgment.

**SO ORDERED** this 26th day of September, 2005.

S/ C. Ashley Royal_____
C. ASHLEY ROYAL
United States District Judge

LTH/hm